# Petition Exhibit 1

Declaration of Dylan Brown, June 19, 2017

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580,

     Petitioner,

v.

**HUMANA, INC.**
500 West Main Street
Louisville, KY 40202,

     Respondent.

Misc. Case No.

---

## DECLARATION OF DYLAN BROWN

Pursuant to 28 U.S.C. § 1746, I declare as follows:

1. I am an attorney employed by the U.S. Federal Trade Commission ("FTC" or "Commission"), in Washington, D.C., in the Mergers 1 division of the Bureau of Competition. I am assigned to the FTC's investigation of the proposed merger between Walgreens Boots Alliance ("Walgreens") and Rite Aid Corporation ("Rite Aid") (FTC File No. 161-0026). This investigation is nationwide in scope and is being conducted by FTC staff attorneys, economists, and other employees at FTC headquarters in Washington, D.C. The purpose of the investigation is to determine whether this proposed merger of major retail pharmacy chains would violate Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair methods of competition" or Section 7 of the Clayton Act, 15 U.S.C. § 18, which prohibits acquisitions that "lessen competition, or . . . tend to create a monopoly."

1

2. I am authorized to execute a declaration verifying the facts that are set forth in the Emergency Petition of the Federal Trade Commission for an Order Enforcing Subpoena *Duces Tecum* Issued in a Merger Investigation. I have read the petition and exhibits thereto (hereinafter referred to as Pet. Exh.), and verify that Pet. Exh. 1 through Pet. Exh. 5 are true and correct copies of the original documents. The facts set forth herein are based on my personal knowledge or information made known to me in the course of my official duties.

3. Humana is a private healthcare insurance provider, with its principal place of business at 500 West Main Street, Louisville, Kentucky 40202. Humana is the one of the largest providers of Medicare Part D insurance plans, which offer benefits and discounts on the costs of pharmaceuticals and pharmacy services for subscribing consumers. Humana is engaged in, and its business affects, "commerce," as that term is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

4. On October 27, 2015, Walgreens and Rite Aid agreed to a merger in which Walgreens would acquire Rite Aid. This merger, which would combine two of the largest pharmacy chains in the country, was reported to the FTC under the Hart-Scott-Rodino Antitrust Improvements Act of 1976. Following some initial fact-finding, the Commission issued an investigational resolution on January 5, 2016, and undertook a detailed review of the proposed transaction that included compulsory process and a second request for information. *See* Pet. Exh. 2. Absent Commission action to block the merger, the parties may consummate the merger on July 7, 2017.

5. As part of its investigation, the FTC is studying the competitive impact of the merger on the retail pharmacy market. The vast majority of retail pharmacy customers are covered by payers, which are typically either private third parties, like corporate employers or insurance

carriers, or government programs, like Medicare Part D and state Medicaid programs. These payers negotiate with retail pharmacies, either directly or through a pharmacy benefits manager ("PBM"), to construct a network of locations to provide pharmacy services to the payer's beneficiaries, *i.e.*, pharmacy customers, at contracted reimbursement rates. When a customer fills a prescription at an in-network pharmacy, the pharmacy dispenses the prescribed medication and submits a claim to the payer or its PBM for payment for the medication based on the reimbursement rate negotiated between the payer and the pharmacy. (The pharmacy may also collect a co-pay from the customer.)

6. The reimbursement rates negotiated between retail pharmacies and the payers and PBMs differ based on (1) the type of retail pharmacy and (2) the type of network the payer desires. The major retail chain pharmacies—Walgreens, Rite Aid, and CVS—typically command the highest reimbursement rates for broad networks because they are usually indispensable to the formation of a viable network. Other pharmacies, including independents and those operated by mass merchants and supermarkets, can often be excluded without materially affecting the network's geographic coverage or attractiveness, so operators of these pharmacies typically receive lower reimbursement rates.

7. The type of pharmacy network also affects the negotiated reimbursement rate. Pharmacy networks fall into one of three basic categories: broad, narrow, or preferred. Broad networks typically include as many retail pharmacies as are willing to participate. Major chain pharmacies are able to negotiate higher reimbursement rates from payers for participation in broad networks because they are critical to the success of these networks. Narrower networks allow payers to offer lower reimbursement rates, as major retail chain pharmacies are willing to trade lower

reimbursement for the additional volume that comes from the exclusion of one or both of their major pharmacy competitors. Preferred networks are a hybrid of broad and narrow networks, in that any pharmacy may participate, but a subset of preferred pharmacies, usually a major retail chain pharmacy, agrees to lower reimbursement rates in exchange for a plan design that incentivizes customers to have their prescriptions filled at its preferred pharmacies. Narrow and preferred networks may be less appealing to customers because they have fewer convenient options to obtain their prescriptions.

8. The Center for Medicare & Medicaid Services ("CMS") approves Medicare Part D plans offered to consumers. This approval involves ensuring that the plans (1) provide their beneficiaries with sufficient access to participating pharmacies in each geographic area, also known as "geo-access," and (2) do not misrepresent the benefits or coverage offered to the beneficiaries. When constructing a plan, a payer such as Humana must ensure that the network is not so restrictive as to make the network unmarketable, or to fall short of meeting CMS-mandated geo-access requirements.

9. Humana, as the leading Medicare Part D provider, offers three preferred plans, including at least one—the "Walmart Rx Plan"—in which Walmart, rather than a major retail chain pharmacy, is the sole preferred provider.

10. Walgreens' proposed acquisition of Rite Aid could tip the balance in these reimbursement rate negotiations in its favor, allowing it to command higher reimbursement rates. Depending on the geographic area where a plan's customers reside, Walgreens could become so significant that it would become a "must have" to meet geo-access requirements or to provide the coverage that a plan's customers desire. A central question in the investigation, therefore, is

Petition Exhibit 1

whether narrow or preferred networks that exclude the combined entity, or all three major retail pharmacy chains—as Humana's Walmart Rx Plan does—would be viable. Documents called for by the subpoena are directly related to answering this question, and thus are of significant importance to the Commission.

11. As part of its investigation, the Commission on April 10, 2017 issued a subpoena *duces tecum* and accompanying subpoena *ad testificandum* to Humana.1 Pet. Exh. 3. The subpoena *duces tecum* included only four specifications. *See, e.g.*, Pet. Exh. 3 at 1-2. Specifications 1 and 2 sought information from Humana relating to the proposed Walgreens-Rite Aid merger and divestiture. Specification 3 sought information regarding the Humana Walmart Rx Plan, for the reasons described above. Specification 4 sought information relating to Humana's communications with CMS.

12. Humana counsel and FTC staff met and conferred regarding potential narrowing of the scope of the subpoena. In order to reduce Humana's burden of compliance, FTC staff agreed that Humana could initially confine its search for documents responsive to Specifications 1 and 2 to two key custodians, and that the FTC would request documents from additional custodians only if it became necessary. FTC staff twice agreed to extend the deadline for production of documents, first on May 1, 2017 and then again on May 8, 2017, for a final return date of May 16, 2017. On May 9, Humana produced five documents totaling 13 pages responsive to Specifications 1 and 2 and committed to producing additional documents responsive to these Specifications following a collection and review.

---

1 The subpoena *ad testificandum* is not presently before this Court. Humana separately filed a petition to quash this subpoena, which the Commission denied on June 15, 2017.

5

13. On May 16, 2017, the deadline for production, Humana requested additional time to produce documents or file a petition to limit or quash the subpoena. Staff declined to extend the return dates absent a definitive schedule for production. Humana also requested modifications to Specification 3, concerning the Walmart Rx Plan, and Specification 4, concerning Humana's communications with CMS. Staff offered both to further limit the subpoena by allowing Humana to confine its production for all four specifications to the two key custodians whose files Humana was already reviewing for Specifications 1 and 2 and to relieve Humana of Specification 3's requirement to produce "all documents" regarding the Humana Walmart Rx Plan. Instead, Humana would be required only to produce documents relating to the itemized subparts of Specification 3, each of which concerns the plan's ability to compete effectively.

14. Humana rejected these offers and, that same day, filed an administrative petition to limit the subpoena by, among others, quashing specifications 3 and 4 in their entirety. Pet. Exh. 4.

15. On June 5, 2017, the Commission ruled and denied the petition, finding no basis or support for Humana's objections. Pet. Exh. 5. The Commission, however, formally modified the subpoena in the following respects, consistent with staff's offer of May 16: (1) Humana needed to search for responsive documents in the possession, custody or control of only two individual custodians; and (2) the scope of documents responsive to Specification 3 was narrowed to only those documents falling within specific categories stated in the specification. *Id.* at 9. The Commission set a new deadline for compliance with the subpoena of June 15, 2017. *Id.*

16. Despite staff's best efforts, nearly one week elapsed before counsel for Humana made themselves available for a substantive telephone call regarding the Commission's ruling and the

new deadline. During that call on June 12, 2017, Humana indicated that it was preparing a "proposal" regarding complying with the subpoena and would present that to staff within a day or so, but that the company was still evaluating whether to comply at all with Specifications 3 and 4.

17.     In the afternoon of June 14, 2017, Humana communicated its proposal: Humana would produce documents responsive to Specifications 1 and 2 on June 15 and documents responsive to Specifications 3 and 4 on or around June 22nd, on the condition that the Commission abandon its related subpoena for testimony. Staff rejected Humana's proposal because, without having an opportunity to review the documents, it would be impossible to know whether the required information was included in Humana's documentary production. Staff did offer, however, to reconsider the necessity of testimony after reviewing the documents. Humana rejected that offer on June 15, and communicated that, while it intended to make a timely production of documents responsive to Specifications 1 and 2, it would not comply with Specifications 3 and 4 unless the testimonial subpoena was withdrawn. Humana also offered to consider a declaration, but did not elaborate on the contents of that hypothetical declaration.

18.     As of close of business on Thursday, June 15, 2017, Humana has not complied with Specifications 3 and 4 of the subpoena *duces tecum* as modified by the Commission.

19.     Humana's non-compliance with the subpoena has burdened, delayed, and impeded the Commission's investigation.

20.     Should the Court order Humana to comply, staff requires the documents no later than June 26, 2017 in order to evaluate this information and prepare a recommendation for the Commission sufficiently prior to the expected consummation of the merger on July 7, 2017. We

require this information in order to recommend Commission action before consummation because our experience has shown that actions to challenge mergers after consummation are difficult and much less likely to be successful in obtaining effective relief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 19, 2017

_____
Dylan Brown
Staff Attorney, Mergers 1 Division
Bureau of Competition
Federal Trade Commission